UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION


| United States of America, | ) | **<u>REDACTED</u>** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | File No. 4:12-cr-177-2 |
| | ) | |
| Nicholas James Gordon Woodford, | ) | |
| | ) | |
| Defendant. | ) | |


<u>TRANSCRIPT OF CHANGE OF PLEA</u>


Taken at
United States Courthouse
Bismarck, North Dakota
March 20, 2013


BEFORE THE HONORABLE DANIEL L. HOVLAND
-- UNITED STATES DISTRICT COURT JUDGE --

<u>APPEARANCES</u>

    MR. DAVID HAGLER
    U.S. Attorney's Office
    220 E. Rosser Avenue
    P. O. Box 699
    Bismarck, North Dakota 58502-0699


                               FOR THE UNITED STATES OF AMERICA


                   - - - - - - - - - -


    MR. ROSS H. ESPESETH
    Attorney at Law
    418 E. Broadway Ave., #240
    P. O. Box 995
    Bismarck, North Dakota 58502-0995


                                  FOR THE DEFENDANT
                     NICHOLAS JAMES GORDON Woodford


                   - - - - - - - - - -


Certificate of Court Reporter - Page 66


                  - - - - - - - - - - - -

1          (The above-entitled matter came before the Court, The

2    Honorable Daniel L. Hovland, United States District Court

3    Judge, presiding, commencing at 9:05 a.m., Wednesday, March 20,

4    2013, in the United States Courthouse, Bismarck, North Dakota;

5    with counsel appearing on behalf of the parties as hereinbefore

6    indicated.   The following proceedings were had and made of

7    record in open court with the defendant and counsel present:)

8                    - - - - - - - - - - -

9          THE COURT:   Good morning.   We'll open the record in

09:05   10   the case entitled *United States versus Nicholas James Gordon*

11   *Woodford*.   Representing the Government here is Assistant U.S.

12   Attorney Dave Hagler.   Representing the defendant is Attorney

13   Ross Espeseth.   And, Mr. Woodford, how are you, sir?

14         THE DEFENDANT:   Fine.

15         THE COURT:   This is scheduled as a change of plea

16   hearing as a result of a written Plea Agreement filed on

17   March 1st of this year on two counts, kidnapping and drug

18   conspiracy.   Mr. Hagler, what are the parties contemplating

19   under the terms of the Plea Agreement?

09:05   20         MR. HAGLER:   Your Honor, the Plea Agreement

21   specifically outlines the potential guideline calculations in

22   paragraph 13.   As it relates to Count 1, we're expecting a

23   total offense level of 41; Count 3, an offense level of 38, and

24   then a combined offense level after an acceptance reduction of

25   40.   It does appear that Mr. Woodford will have a Criminal

3

1   History Category I, and if that's the case, the 40 and one

2   results in a 292- to 365-month range, Your Honor.

3   ████████████████████████████████████████

4   ████████████████████████████████████████████

5   ████████████████████████████████████████████

6             THE COURT:   And, Mr. Espeseth, you've come up with

7   similar guideline calculations?

8             MR. ESPESETH:   Correct, Your Honor.

9             THE COURT:   All right.  Well, Mr. Woodford, I need to

09:06   10   visit with you here this morning, ask you a few questions about

11   your intent to plead guilty to these two counts.  I want to

12   make sure that you have a clear understanding of what it is

13   you've been charged with, what the maximum penalties are under

14   federal law for these offenses.  I want you to know that you're

15   free to ask questions at any time.  If there's anything that

16   you don't understand about the Plea Agreement, the charges, the

17   sentencing guidelines or anything else, please feel free to

18   interrupt and ask questions.  I'm going to have you sworn in

19   first.

09:07   20             THE CLERK:   Please stand, raise your right hand.

21             NICHOLAS JAMES GORDON WOODFORD,

22   having been first duly sworn, was examined and testified as

23   follows:

24             THE COURT:   I don't know a whole lot about you, sir.

25   I haven't seen much to do with this case, but maybe you can

4

1  tell me a little bit about yourself, first of all, how old you

2  are, where you grew up, went to school.

3        THE DEFENDANT:  Well, I'm 22 years old.  I turn 23 in

4  May.  I grew up in Las Vegas, Nevada, and California, between

5  -- a single mom, and I -- in 2011 I graduated from Everest

6  College with an Associate's degree in medical assisting, so --

7        THE COURT:  So you got a high school degree and a

8  two-year Associate degree.

9        THE DEFENDANT:  Yes.

09:08   10        THE COURT:  Okay.  And how did you do in school?

11        THE DEFENDANT:  Fairly well.  Fairly well.  My GPA

12  was a 3.86.

13        THE COURT:  In college?

14        THE DEFENDANT:  Yes.

15        THE COURT:  So at some point in time you must have

16  started using street drugs.

17        THE DEFENDANT:  Very early.  Actually, I started

18  using drugs at 11, and until incarceration I really didn't have

19  a sober time per se of any longer length than a week, or so,

09:08   20  longer than I could sleep.

21        THE COURT:  But still did well in school.

22        THE DEFENDANT:  If I put my mind to something and I

23  wasn't distracted by other stuff, then, yeah, I was able to do

24  well.

25        THE COURT:  Do you have any problems in any juvenile

5

1    courts anywhere?

2         THE DEFENDANT:  No, sir.

3         THE COURT:  Ever been treated for any drug-alcohol

4    problems?

5         THE DEFENDANT:  No, but I have been treated for other

6    disabilities, mental --

7         THE COURT:  Such as?

8         THE DEFENDANT:  I've had three cranial contusions

9    since the sixth grade.

10        THE COURT:  What?

11        THE DEFENDANT:  Concussions.

12        THE COURT:  Oh, okay.

13        THE DEFENDANT:  I've chipped nerves in the back of my

14   brain.  I've bled on my brain, just -- the only real effect

15   that that's had is in decisionmaking and coping skills.  I

16   don't cope well with -- which is part of the reason why I've

17   used drugs for so long, because it helped me cope, to an

18   extent.

19        THE COURT:  But what did you start using as

20   11-year-old?

21        THE DEFENDANT:  Whatever I could get my hands on,

22   actually.  The first time I did meth was right before my mom

23   moved me to meet my dad, and that was at 12, so at 11 I was,

24   you know, smoking pot with some friends and drinking, and it --

25   it's escalated from there.

6

1          THE COURT:  And your street drug of choice is what,

2    meth?

3          THE DEFENDANT:  No, actually my preferred drug of

4    choice is marijuana.

5          THE COURT:  Okay.

6          THE DEFENDANT:  But meth is really addictive, so

7    when -- when it's there, I don't hesitate to use it previous to

8    this particular incident.  But, yeah, my -- my preferred drug

9    of choice is marijuana.

09:11    10          THE COURT:  So when your meth usage began to

11    escalate, did you start shooting up, or have you always been a

12    smoker?

13          THE DEFENDANT:  Yeah, at the very tail end of my meth

14    usage, right before incarceration, I did begin to shoot up and

15    it affected me greatly, but at the same time it's -- it was at

16    such a light stage of addiction that -- the injection part,

17    that it didn't -- that didn't get me as much as the smoking

18    did.  Smoking meth was my big thing.

19          THE COURT:  So is your mother still around?

09:11    20          THE DEFENDANT:  Yes.

21          THE COURT:  And lives in Las Vegas?

22          THE DEFENDANT:  Yes.

23          THE COURT:  And does she know where you're at today?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Do you have any brothers and sisters?

7

1          THE DEFENDANT:  I have two younger sisters.

2          THE COURT:  And where are they at?

3          THE DEFENDANT:  Currently one is in Mesquite on a

4    softball trip because she's in A League travel ball in her

5    division, the Southwest.  And my other one is currently

6    enrolled in UNLV, and that's in Las Vegas, Nevada.  They both

7    live with my mother in Las Vegas, Nevada.

8          THE COURT:  And how old are they?

9          THE DEFENDANT:  We're all four years apart, so I'm

09:12   10   22, turning 23.  Autumn is turning 19 in September, and Shannon

11   is 15, I want to say.

12         THE COURT:  And after you obtained your Associate

13   degree, did you continue to live and work in the Vegas area?

14         THE DEFENDANT:  As much as I could, but the work out

15   there just wasn't as prominent as it was in other places, but I

16   did work in the medical field in Las Vegas, Nevada, for IMS, in

17   internal medicine.

18         THE COURT:  And then when did you come to North

19   Dakota?

09:12   20         THE DEFENDANT:  March 3rd.

21         THE COURT:  Of?

22         THE DEFENDANT:  Last year.

23         THE COURT:  Okay.  And the oil field work dragged you

24   up here?

25         THE DEFENDANT:  Actually, no, the lack of work in Las

8

1   Vegas and my uncle wanting to not be in North Dakota by

2   himself.

3           THE COURT:  Okay.

4           THE DEFENDANT:  My uncle is currently in Williston,

5   working on the rigs, and he didn't want to be up here by

6   himself and he dragged me along up here with him, and I -- I

7   was working in a hospital for a little bit as a phlebotomist,

8   but --

9           THE COURT:  In Williston?

09:13   10           THE DEFENDANT:  Yes, and I failed the urinalysis and

11   they found marijuana in my system.  And after that I just kind

12   of got into it with my uncle, you know, pointed fingers at him,

13   blaming him for me being up here with nothing, and we got into

14   a physical altercation.  And me being of legal age as an adult,

15   I decided, well, I'm not running away if I leave.  I'm just

16   walking away.  I'm just leaving the situation, so I left the

17   situation and ran into the wrong crowd.

18           THE COURT:  Okay.  In Williston?

19           THE DEFENDANT:  In Williston, yes.

09:14   20           THE COURT:  And the wrong crowd is Mr. Butler, Mills,

21   and White?

22           THE DEFENDANT:  Yes.

23           THE COURT:  Have you ever been treated for any mental

24   condition of any sort?

25           THE DEFENDANT:  As a child I was treated with

1    post-traumatic stress disorder and post-traumatic migraine

2    syndrome.

3              THE COURT:  And the stress -- post-traumatic stress

4    related to anything in particular, or --

5              THE DEFENDANT:  Violence against women and sexual

6    assaults.  I watched my mom get beaten and raped for ten years

7    of my life by my step-dad, so --

8              THE COURT:  Okay.

9              THE DEFENDANT:  -- I have a big issue with that.

09:14    10              THE COURT:  And had you been treating with a

11    professional, counseling and --

12              THE DEFENDANT:  Yeah, a pediatric neurosurgeon and a

13    therapist in Las Vegas, Nevada, and in California.

14              THE COURT:  And were on medications for a while of

15    some sort?

16              THE DEFENDANT:  Yes, I was on Gabapentin, Dilaudid,

17    Thoratab (ph), Xanax, a lot of those.

18              THE COURT:  Were you experiencing seizures as well,

19    or --

09:15    20              THE DEFENDANT:  Not that I can recall.  You would

21    have to actually ask my mom, but I was never hospitalized for

22    that, for any seizures, but the migraines caused by the stress

23    would cripple me like a seizure and I would be able to do

24    nothing.  And it got to the point where the medication was

25    being taken by someone else in the household, and the marijuana

1    on the streets was easier to obtain for me and it calmed my --

2    it calmed my headaches.  It calmed me down.  I didn't have a

3    violent outburst.  I just -- I mellowed out and got hungry.

4           THE COURT:  So when did you discontinue any of those

5    medications?

6           THE DEFENDANT:  On and off since the age of 11.

7           THE COURT:  Okay.  Are you on any medications now?

8           THE DEFENDANT:  No.

9           THE COURT:  But your mind is clear today?

09:16      10           THE DEFENDANT:  As clear as it has been in the

11   longest time that I can remember.

12           THE COURT:  And when were you taken into custody, and

13   where have you been spending time?

14           THE DEFENDANT:  I've been -- I was -- I was taken

15   into custody August 23rd of last year.  I did approximately two

16   weeks in Williams County, Williston, county jail.  Then I did

17   about three months in Pierce County, Rugby.  I did a couple

18   months in Burleigh County, and currently I'm residing in

19   Jamestown, Stutsman County.

09:16      20           THE COURT:  And how have you been treated in custody?

21           THE DEFENDANT:  Rugby was a little harsh because the

22   COs over there are -- they're kind of like RoboCops, is the

23   best way I can describe them.  You know, a lot of us inmates

24   are younger, so some of them are wild.  I personally wasn't a

25   wild one, but they saw me as that, and it was stressful, very

11

1  stressful, and there was nothing that could be done because of

2  the marshal inmate.  I couldn't get any psychotic medication.

3  I couldn't get any antidepressants or anything like that, so I

4  pushed through.  I just pushed through.

5          THE COURT:  And Stutsman County is far better?

6          THE DEFENDANT:  Far better.  Far better.

7          THE COURT:  And so tell me how you met Mr. Butler and

8  the others that have been charged here.

9          THE DEFENDANT:  I initially met Odeneal first.

10          THE COURT:  Who?

11          THE DEFENDANT:  James Dean Odeneal.

12          THE COURT:  Okay.

13          THE DEFENDANT:  He was a good friend of mine.  I met

14  him at a job that we both had.

15          THE COURT:  That was the guy that was beat up?  No.

16          THE DEFENDANT:  No, sir.

17          THE COURT:  Okay.  James Odeneal and Tyler White, but

18  Odeneal is not charged, is he?

19          MR. HAGLER:  Yes, he is.

20          THE COURT:  In this same conspiracy?

21          MR. HAGLER:  Yes.

22          THE COURT:  Oh, okay.  Okay.  Go ahead.  I'm sorry.

23          THE DEFENDANT:  I met Odeneal first.  Me and him

24  became good friends at work, and he hit a hard spot and he

25  found a place to live.  And when that happened, I hung out at

his newfound home and proceeded to meet everyone in order of

Butler, White, Mills -- Butler, White, Osterhout, then Mills,

in that order.

THE COURT:  And these guys were all from out of state

living in the Williston area and working in some capacity in

the oil fields?

THE DEFENDANT:  You mean do they all have jobs?

THE COURT:  Right.

THE DEFENDANT:  No.

THE COURT:  Okay.  And so how did the relationship

evolve?

THE DEFENDANT:  Well, being a drug user, I noticed

Butler -- I noticed Butler was high, so I figured, you know, I

want to get high.  I got to go to him because he was the one

who's currently gaged out, as they say, and it turned for the

worst.  I was told prices.  I was told things, and things just

went for the worst.  He didn't hesitate.  You know, when I gave

the guy money, he gave it -- he gave it right back, and then it

just proceeded from there.

I'm a generally -- I'm a generally nice guy, you

know, so when I run into people like White, whose wife at the

time threw his clothes into the mud while it was raining -- I

didn't know White at the time.  I picked his clothes up out of

the mud and took them out of the rain, just as I felt Butler

had did for me in a sense, and, you know, we just kind of took

13

1   people in.  People who looked like they were having a hard time

2   in life, we just kind of took them in.

3            THE COURT:  But all living in the same household?

4            THE DEFENDANT:  To an extent.  There was a household

5   there, but we didn't live in the house.  We paid rent and lived

6   on the backyard in -- in approximately four campers on the

7   property.

8            THE COURT:  Who lived in the house?

9            THE DEFENDANT:  A gentleman named Larry Larson.

09:21   10            THE COURT:  And Larson owned a house, or --

11            THE DEFENDANT:  Yes.

12            THE COURT:  And he would rent spots in the backyard

13   to people.

14            THE DEFENDANT:  For people who were in need he did.

15            THE COURT:  Okay.

16            THE DEFENDANT:  People -- it wasn't like he was the

17   landlord, or anything.  It was more like, hey, my friend needs

18   a place to stay.  He has a camper and he has a job and he can

19   pay rent.  And he was such a nice guy that he didn't seem to

09:21   20   have a problem with it at all.

21            THE COURT:  And what would he charge you?

22            THE DEFENDANT:  Depending on who you were.  I mean,

23   if you were in a really hard spot, he would go as low as $200 a

24   month, you know, and let you use the restroom and laundry

25   facility in his house.  And then if you weren't as hard off, it

1    would go all the way to five, six hundred dollars a month.   I

2    mean, the only thing was that, you know, you had to be his

3    friend pretty much, and that's how nice that man was, is he

4    just wanted company.

5             THE COURT:   And how old a guy is he?

6             THE DEFENDANT:   He's an older gentleman.   I'd have to

7    say sixties, maybe seventies.

8             THE COURT:   A drug user?

9             THE DEFENDANT:   No, no, a drunk, but not a drug user.

10            THE COURT:   Okay.   And then so you lived in a camper

11   in the backyard area?

12            THE DEFENDANT:   Yes.

13            THE COURT:   With whom?

14            THE DEFENDANT:   With whoever I wanted to stay with.

15   It was -- the people who lived back there were Odeneal, White,

16   Butler, Mills, and then a handful of other people we met

17   through jobs and through places of work, but those -- the four

18   of us -- five of us lived there for the most part.   And not one

19   camper was mine, to say that this was mine, so if I wanted to

20   sleep in any -- in any facility, any house, in the house or in

21   any camper, I could.

22            THE COURT:   But nobody really working in any

23   meaningful employment?

24            THE DEFENDANT:   I did.   I had two jobs.   I worked at

25   Hardee's and then I worked at Sherwin-Williams.   And then I

15

1  quit Hardee's to get a job at IKH Oil Field Services and become

2  a roustabout on the oil rigs, so then I worked at the oil

3  fields -- I worked at IKH, and then I worked at Sherwin-

4  Williams, so I worked at two jobs.

5      THE COURT:  So full-time?

6      THE DEFENDANT:  Full-time.

7      THE COURT:  But the other four men were essentially

8  doing nothing?

9      THE DEFENDANT:  Essentially, yeah, they -- yeah.

10     THE COURT:  Selling dope.

11     THE DEFENDANT:  I'm not exempt from that.  I sold

12 dope as well, but, yeah, that's what they did.

13     THE COURT:  Okay.

14     THE DEFENDANT:  That's where the money -- that's

15 where the money came from.

16     THE COURT:  And selling just methamphetamine, or --

17     THE DEFENDANT:  No, sir.

18     THE COURT:  Pardon?

19     THE DEFENDANT:  No, sir.  We sold cocaine and

20 marijuana.

21 ████████████████████████████████████████████

22 ██████████████████████

23 ██████████████████████████████████████████████

24 ███

25 ██████████████████████████████████████████

16





























1

2

3

4

5

6

7

8

9

10    THE COURT:  Okay.  And so tell me what happened in

11 August, when the world came crashing in.

12    THE DEFENDANT:  Well, I was having intercourse with a

13 girlfriend at the time.

14    THE COURT:  Pardon?

15    THE DEFENDANT:  I was having intercourse with a

16 girlfriend at the time that morning and --

17    THE COURT:  Back in a trailer?

18    THE DEFENDANT:  Yes.

19    THE COURT:  Okay.

20    THE DEFENDANT:  And I had heard, "Get down, get down,

21 get down," so I had stopped and I told her to listen.  She had

22 stopped.  In that time frame -- the camper I was in at the time

23 was technically on 819 West Broadway, not on 821 West Broadway

24 property, 819, so in that -- not knowing that, we had enough

25 time to get dressed, to fix up two more shots for her and for

1    me, to sit back, smoke a cigarette and send text messages to

2    people, telling them we were getting raided.  We had like a

3    good 10, 15 minutes, and we sat there and let it happen.  And

4    when the world came crashing down, we -- we had a plan.  There

5    was supposed to be a plan between the group to go out like

6    Billy the Kid, go out in a hail of bullets.  When everything

7    went down, I didn't hear any gunshots, so I didn't shoot.

8            THE COURT:  But you had a gun in the trailer with

9    you.

10           THE DEFENDANT:  Yes.

11           THE COURT:  Multiple guns or one gun?

12           THE DEFENDANT:  One.

13           THE COURT:  And what was it?

14           THE DEFENDANT:  A nine millimeter Ruger.

15           THE COURT:  Pardon?

16           THE DEFENDANT:  Nine millimeter Ruger.

17           THE COURT:  Okay.  That you would generally carry

18   with you all the time?

19           THE DEFENDANT:  Sometimes.  It wasn't my favorite.

20           THE COURT:  But that was the day of the arrest.  What

21   -- correct?

22           THE DEFENDANT:  Yes.

23           THE COURT:  Okay.  But the days before that, this

24   incident with Robert Osterhout, what all -- what all played out

25   there?

32

1          THE DEFENDANT:   There was a minor incident previous

2     to that and Osterhout had spoken to Mills' girlfriend about

3     that incident in a public place, and he spoke about it very

4     loudly.

5          THE COURT:   What do you mean, "a minor incident"?

6     What does that mean?

7          THE DEFENDANT:   Mills was caught stealing from us.

8          THE COURT:   Mills?

9          THE DEFENDANT:   Yeah.

10         THE COURT:   Stealing drugs?

11         THE DEFENDANT:   No, property.

12         THE COURT:   Okay.

13         THE DEFENDANT:   And he got punished for it, I guess

14     you could say, and --

15         THE COURT:   He got beat up by somebody.

16         THE DEFENDANT:   Yeah.  I was -- it says in the

17     paperwork that I beat him up.  I did not.  I was at work that

18     day.  I was there when he was hogtied and thrown into a

19     basement, but I was not there when he actually got beat up, so

20     -- but --

21         THE COURT:   So in whose basement, Larson's?

22         THE DEFENDANT:   Yes, sir.

23         THE COURT:   Okay.  But what did he -- what did Mills

24     steal from the group?

25         THE DEFENDANT:   A laptop and a watch.

33

1    THE COURT:   And he stole it from whom?

2    THE DEFENDANT:   A nonaffiliated friend of ours.

3    THE COURT:   What is a nonaffiliated friend of yours?

4    THE DEFENDANT:   Someone who had no idea what we were

5    doing.

6    THE COURT:   Okay.   So then who ordered that Mills be

7    hogtied and beat up as a result of that?

8    THE DEFENDANT:   Butler.

9    THE COURT:   Okay.   And so that happened in the

10   basement of Larson's home.

11   THE DEFENDANT:   Yes, and then --

12   THE COURT:   Osterhout was there or heard about it?

13   THE DEFENDANT:   He was there.

14   THE COURT:   And saw it happen.

15   THE DEFENDANT:   Participated, as far as I understand.

16   THE COURT:   Okay.   And he's a user as well?

17   THE DEFENDANT:   Very much so.

18   THE COURT:   But why would he have been a participant

19   in the group's beating up of Mr. Mills?   What does Osterhout

20   have to do with your group?

21   THE DEFENDANT:   He was a user and he was what you

22   kind of -- what we would call a middleman.   He had people that

23   we didn't want to deal with.   He dealt with those people.   You

24   know, that's -- he's part of the reason why we didn't have

25   anybody owe us money.   He had a job, so when people owed him

34

1    money, he would let that slide, or whatever he decided to do

2    with it, and he would pay us out of his hard-earned money on

3    that.  And he liked hanging around.  He just -- he was what was

4    known as like a hang-around.

5              THE COURT:  So is he in his early twenties as well?

6              THE DEFENDANT:  No, sir.  He's also an elderly

7    gentleman.

8              THE COURT:  Okay.  And so then he was in a bar

9    spouting off about Mills getting beat up?

10             THE DEFENDANT:  He was in a grocery store.

11             THE COURT:  Okay.

12             THE DEFENDANT:  And his -- Mills' girlfriend hit me

13   up on a text message, asking what was going on.  I left work,

14   went home, checked it out, and Osterhout was there and saw what

15   was going on.  Did some dope.  Went back to work.  Came home,

16   and when I got home, Mills was downstairs with Butler and

17   others, and Mills said that he would take a bullet for Butler

18   if the -- if Butler would spare his life, and Butler agreed, so

19   Mills lived.  And Osterhout -- when Osterhout told Mills'

20   girlfriend what was going on, he had made it seem as if there

21   was torturing going on, and to my knowledge, I didn't see any

22   torturing, but Mills was -- you know, Mills was bruised up.

23             And then during that we had caught wind that

24   Osterhout was telling Williston P.D. or whomever on us.  He was

25   telling on us to other people, not only to Zachary Mills'

35

1   girlfriend.  Well, I get then told to invite Osterhout back to

2   the campsite, back to the little compound we had, and I did.

3   And when I invited him back, he came back and he said he was

4   being followed by the FBI.  Now, all of us being on meth just

5   immediately flipped out.  We just -- you know, and we told him,

6   "And you decided to come back here when you know that, you

7   know, these things are going on?  You're being followed by

8   people, and you're going to come back here?"  And when that

9   happened, I was instructed to make Osterhout comfortable.

09:51   10   THE COURT:  By whom?

11   THE DEFENDANT:  By Butler.

12   THE COURT:  And what does that mean?

13   THE DEFENDANT:  I apparently misunderstood what that

14   had meant because I got into trouble myself at the end of the

15   whole thing because when I was told to make him comfortable, I

16   thought that meant to knock him out, literally make him

17   unconscious, and I did that.

18   THE COURT:  In the basement of Larson's home?

19   THE DEFENDANT:  No, in the camper in the backyard.

09:52   20   THE COURT:  Okay.  Punched him?

21   THE DEFENDANT:  Me and Mills pretty brutally messed

22   up Osterhout.  Now, I'm not going to exclude myself from this

23   at all because I was there.  I did it, you know, but at the

24   same time so was Zachary Russell Mills.  He was also there.  He

25   tried to downplay it in some of his statements that I've seen,

36

1  but, no, he was there.  He tazed him as well as I did.  He

2  tortured him as well as I did with the torch lighter.  He

3  kicked him, beat him, choked him, jumped on him just as much as

4  I did.  We were so high at the time we actually turned it into

5  a game and said --

6           THE COURT:  So who was there at the time, you and

7  Mills and White?

8           THE DEFENDANT:  White was instructed by me to stand

9  in front of the camper and make sure that any dope fiend or

10 anybody else that came by was to not enter this particular

11 camper.

12          THE COURT:  So who was in the camper while Osterhout

13 was getting pummeled?

14          THE DEFENDANT:  Me and Mills.

15          THE COURT:  Okay.

16          THE DEFENDANT:  And then that happened, and then

17 Butler came in and was highly upset.  He did not like what he

18 saw because I did wrong in his eyes.  I wasn't supposed to do

19 that.  I was supposed to make Osterhout feel comfortable.

20          THE COURT:  What does that mean, finding him a

21 recliner with a nice blanket and a cup of hot chocolate, or --

22          THE DEFENDANT:  Apparently so.

23          THE COURT:  Okay.

24          THE DEFENDANT:  Because what I did -- what I thought

25 I was supposed to do was wrong.  I mean, apparently I was

1   supposed to, exactly, put him in a recliner with a blanket and

2   a cup of coffee.  Well, when Butler saw that, he decided that I

3   had to finish what I started, so he told me to finish it, so I

4   instructed Mills -- I instructed White and Odeneal to line the

5   trunk with camper -- to line the trunk of a car with plastic.

6           THE COURT:  And they were in another trailer?

7           THE DEFENDANT:  No, they were outside handling

8   ordeals with other individuals.

9           THE COURT:  Okay.

09:54  10           THE DEFENDANT:  And they did what they were told, and

11   me and Mills hogtied Osterhout and threw him into the trunk.

12   And then Butler told Odeneal to stay in the yard and watch the

13   yard while me, Mills, White and Butler took Osterhout in the

14   trunk of a car across state lines, apparently.  I didn't know

15   we crossed state lines, but we did.

16           THE COURT:  Okay.

17           THE DEFENDANT:  Osterhout pulled the emergency

18   release lever in the trunk and escaped.

19           THE COURT:  After you had stopped someplace or

09:55  20   while --

21           THE DEFENDANT:  Yes.

22           THE COURT:  -- the car was going?

23           THE DEFENDANT:  After we had stopped someplace, and

24   when that happened, Butler had turned and said, "If you don't

25   kill him, I will kill you."

38

1          THE COURT:  And where had you stopped, do you

2    remember?

3          THE DEFENDANT:  On a dirt road in the middle --

4          THE COURT:  This was in the evening or during the

5    daytime?

6          THE DEFENDANT:  This was maybe -- maybe 11:30,

7    12 o'clock midnight.

8          THE COURT:  Okay.  So you stopped on a dirt road

9    somewhere.

09:55    10          THE DEFENDANT:  Yes, and when Osterhout escaped from

11    the trunk, Butler turned to me and Mills and said, "If you

12    don't kill him, I will kill you."  So without hesitation I

13    jumped out of the car and chased Osterhout down to the location

14    that he was at, and I proceeded to assault him again until

15    he -- the only thing I can remember is that I assaulted him and

16    jumped on his head until he quit gurgling.  When he quit

17    gurgling, I thought he was dead.  Now, at the time the people

18    who were around me were Butler and Mills.  White was up at the

19    dirt road watching for traffic.  I don't know why.  It was a

09:56    20    dirt road.  I didn't think any traffic would be coming anyways,

21    but that's what he did.

22          And me and Mills and Butler proceeded at that point

23    in time to go up the hill, back into the car after we heard the

24    gurgling stop.  You can see in the paperwork, if you look

25    through it, that about 20 minutes down the road I vomited

39

1  because reality had set in.  Previous to assaulting Osterhout

2  the first time, I had did about a 50-unit shot of meth, which

3  is a decent amount, especially for someone who's not an IV drug

4  user.

5          THE COURT:  Fifty units equates with what?

6          THE DEFENDANT:  Five milliliters -- or it's in the

7  syringe.  The syringes come in different sizes, but there's

8  diabetic syringes which come in like a 30-unit, which is like

9  30 milliliters, and then there's a hundred units, and so I

10  filled up half of one of those and did that, so I did about --

11  I mean, I don't know if it's 5 or 50 milliliters, but I know

12  it's called 50 units, and I just know that's what it's called,

13  and so I did that before I had assaulted Osterhout.

14          THE COURT:  The first time.

15          THE DEFENDANT:  Yes, and it was -- that's what led

16  the whole thing kind of, the misunderstanding of making him

17  comfortable to the attempt on his life.

18          THE COURT:  So when you left him out in the middle of

19  nowhere at midnight, you assumed he was dead?

20          THE DEFENDANT:  Yes.

21          THE COURT:  And Mills was there as well?

22          THE DEFENDANT:  Yes.

23          THE COURT:  And was Mills involved in --

24          THE DEFENDANT:  Yes.

25          THE COURT:   -- assaulting Osterhout the second time

40

1    out in the middle of nowhere?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  Okay.  And so when you got back to the

4    car, Butler was by the car?

5              THE DEFENDANT:  One more time?

6              THE COURT:  I mean, when you -- you got back to the

7    car at some point in time.

8              THE DEFENDANT:  Yes.

9              THE COURT:  And was the body near the car, or --

10             THE DEFENDANT:  No, no, it was a ways away.

11             THE COURT:  Okay.

12             THE DEFENDANT:  It seemed a ways away.

13             THE COURT:  But had Butler remained at the car when

14   you had --

15             THE DEFENDANT:  No, the only person who remained at

16   the car was White.

17             THE COURT:  But Butler was out there with you when

18   you were assaulting Osterhout the second time?

19             THE DEFENDANT:  Yes.

20             THE COURT:  Okay.  And then where did you go?

21             THE DEFENDANT:  Home.  Then I went right back to

22   work.

23             THE COURT:  And how many days after this or hours

24   after this happened was the -- did the arrest and raids occur?

25             THE DEFENDANT:  Three weeks later.

                                    41

1          THE COURT:   Three weeks later?

2          THE DEFENDANT:   Yep.

3          THE COURT:   So in that three-week interim, all of you

4    were still continuing to live your normal -- so-called normal

5    lifestyle in Williston in the trailers and --

6          THE DEFENDANT:   Yes.

7          THE COURT:   Nobody got scared and decided to run off,

8    get so far away from Williston they could never be found again?

9          THE DEFENDANT:   Me and Mills had feelings like that,

10:00  10    but once again, the drugs -- I -- Mills got more scared than I,

11    took his girlfriend one day when I was at work and left.   I was

12    working for IKH Oil Field Services, and believe it or not, I

13    was -- I was doing everything I could to get away from the

14    situation, period, the dope dealing, everything.   Now, as a

15    user I stayed around and I got high.   I could do that.   I was

16    able to, but --

17          THE COURT:   But was Mills the one that took off,

18    headed west?

19          THE DEFENDANT:   Yes.

10:00  20          THE COURT:   And then is he the guy that stopped

21    somewhere and talked to law enforcement, or --

22          THE DEFENDANT:   Yeah, he stopped in Billings,

23    Montana, I guess.

24          THE COURT:   Okay.   But everybody else just laid low

25    and hung out in Williston and --

1          THE DEFENDANT:   We didn't lay low.   It wasn't a

2     lay-low situation.   It was --

3          THE COURT:   Business as usual?

4          THE DEFENDANT:   Yep.

5          THE COURT:   Okay.   And in this three-week period of

6     time, no discussions amongst yourself and Butler about what

7     happened or what was going to happen, or --

8          THE DEFENDANT:   Yes.

9          THE COURT:   -- things you should do differently so we

10:01    10     don't get caught?

11          THE DEFENDANT:   There were discussions.   The

12     discussions were -- because I had left my cellphone at the

13     scene, and the discussions were always about me getting out of

14     the situation so that I don't get caught, and everything was

15     supposed to fall on Butler's shoulders.   And then when Butler

16     got arrested, we were all supposed to continue business as

17     usual and take care of his wife.

18          THE COURT:   Take care of his --

19          THE DEFENDANT:   His wife.

10:01    20          THE COURT:   -- wife?

21          THE DEFENDANT:   Wife.

22          THE COURT:   Where was she?

23          THE DEFENDANT:   She was right there.

24          THE COURT:   Oh, she lived there all the time with

25     him?

1          THE DEFENDANT:   The whole time.

2          THE COURT:   Okay.   So she knew what was going on.

3          THE DEFENDANT:   Yes.

4          THE COURT:   And she's a user as well, I would assume.

5          THE DEFENDANT:   Yes.

6          THE COURT:   And she's in her forties?

7          THE DEFENDANT:   As far as I know, yes.

8          THE COURT:   Okay.   So was he, that being Butler,

9   arrested before you were arrested?

10         THE DEFENDANT:   Technically, yes.   We were all -- we

11  were all raided on the same day, but I was the last one to be

12  put in handcuffs, so he was arrested before I was.   He was put

13  in handcuffs before I was.   He was booked into the Williams

14  County Jail before I was.

15         THE COURT:   So where's his wife?

16         THE DEFENDANT:   As far as I know, she's released.

17         THE COURT:   She was arrested as well?

18         THE DEFENDANT:   Yes.   Yes.

19         THE COURT:   So from what you've told me, it sounds

20  like you've had a chance to review all of the discovery that

21  the Government has turned over?

22         THE DEFENDANT:   As much as I've been given, yes.

23         THE COURT:   You gave statements, I assume, to --

24         THE DEFENDANT:   I gave a small statement, not as

25  extensive as the one I just gave you.

44

1                THE COURT:  Oh, okay.  But you saw statements that --

2      if there were statements given by others, you've seen those?

3                THE DEFENDANT:  The ones I've been given, yes.

4                THE COURT:  Okay.  And Mr. Espeseth was appointed by

5      the Court to represent you?

6                THE DEFENDANT:  Yes.

7                THE COURT:  And do you feel that you've had

8      sufficient time to sit down with him and review this case with

9      him?

10:03   10                THE DEFENDANT:  Yes.

11                THE COURT:  And you've signed a Plea Agreement.  Did

12      you review that with him in detail before you ever signed it?

13                THE DEFENDANT:  Yes.

14                THE COURT:  And you read it before you signed it?

15                THE DEFENDANT:  Yes.

16                THE COURT:  And you're able to read and understand

17      English well?

18                THE DEFENDANT:  Yes, sir.

19                THE COURT:  Do you have any criticisms or complaints

10:03   20      about the legal assistance and advice that you've received from

21      Mr. Espeseth to date?

22                THE DEFENDANT:  To date, no.

23                THE COURT:  Okay.  Well, I need to cover a few things

24      with you here as a part of this hearing.  One is I need to make

25      sure you understand what the maximum penalties are for each of

45

1    these offenses, and those maximum penalties are outlined in the

2    Plea Agreement, but I need to cover them with you here.

3    Count 1, which is a kidnapping offense, carries a maximum

4    sentence of life in prison, maximum fine of $250,000, a minimum

5    period of supervision of five years, and a requirement that you

6    pay a $100 special assessment.

7            The drug conspiracy charge, which is Count 3,

8    carries, I believe, a maximum of 20 years in federal prison, a

9    maximum fine of a million dollars, placement on supervised

10   release for three years, and the requirement that you pay a

11   $100 special assessment.  Those, I believe, are the maximum

12   penalties.  Is that correct, Mr. Hagler?

13           MR. HAGLER:  Yes, Your Honor.

14           THE COURT:  Okay.  Do you have any questions about

15   those penalties, Mr. Woodford?

16           THE DEFENDANT:  No, Your Honor.

17           THE COURT:  Are there any mandatory minimums that are

18   triggered in either of these counts?

19           MR. HAGLER:  There are not, Your Honor.  The drug

20   conspiracy count, we did not allege a threshold amount, so

21   there is no amount alleged that would trigger either the five-

22   or ten-year minimum, so there are no minimums.

23           THE COURT:  So why was that done?

24           MR. HAGLER:  When we first indicted the case, Your

25   Honor, it was -- it was pretty early on and before a lot of the

46

1   statements were given, so we just simply alleged a general meth

2   conspiracy. ████████████████████████████

3   ████████████████████████████████████████

4   ████████████████████████████████████

5   ████████████████████████ but again, Your Honor, quite

6   frankly, the kidnapping charge is probably going to carry more

7   than or at least as much as the drug count as well.

8         THE COURT:  Then, Mr. Woodford, I need to make sure

9   that you understand what your Constitutional rights are as a

10   defendant.  Those rights are also summarized in the Plea

11   Agreement.  The most important right that you have is a right

12   to a jury trial on this offense.  Every defendant has a right

13   to a jury trial in federal court, so rather than plead guilty

14   to anything, you could maintain your initial plea of being not

15   guilty and demand a trial.  And if you did that, then this case

16   would be played out and presented to a jury of 12 individuals

17   selected by both attorneys in this courtroom.

18         And if the case proceeded to trial, you are presumed

19   to be innocent, and it's the Government that bears the burden

20   of proof at trial.  The Government has to call witnesses and

21   present evidence to convince the jury that you are guilty of

22   the essential elements of these crimes.  And the verdict has to

23   be unanimous in that regard.  If you chose to go to trial, you

24   would be represented by your attorney, and Mr. Espeseth would

25   have an opportunity to cross-examine every witness, challenge

10:06

10:06

1    every piece of evidence that the Government would introduce at

2    trial.   As a defendant you don't have to prove or disprove

3    anything, but you have a right to present a defense at trial

4    and you also have a right to testify.

5           But you can't be forced to testify.   You also have a

6    right to remain silent, and that means you can go to trial and

7    you cannot be compelled or forced to testify by anyone.   And if

8    you chose to go to trial and remain silent, the jury is always

9    given a specific instruction telling them that they are not to

10:07
10   hold that against you.   They are not to conclude that you've

11   done anything wrong simply because you've chosen to defend

12   yourself at a trial and not testify.   Do you understand all

13   that?

14          THE DEFENDANT:   Yes, sir.

15          THE COURT:   And if you went to trial and you were

16   convicted on any of these counts, you would have a right to

17   appeal that jury decision, and you would also have a right to

18   appeal any sentence that I would order you to serve on those

19   convictions.

10:08
20          You also have a right to plead guilty.   Nationwide

21   95 percent of criminal cases in the federal system are resolved

22   by defendants signing plea agreements and entering pleas of

23   guilty, but when you sign a plea agreement and choose to plead

24   guilty, then you give up a number of important things.   You

25   will be giving up your right to a jury trial and we will have

48

1    no trial.  Do you understand that?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  And as a result of the Plea Agreement,

4    and there's a specific paragraph in that Plea Agreement that

5    I'll talk to you about, you have also agreed to give up your

6    right to appeal these felony convictions on your record, as

7    well as the sentence that I order you to serve as long as the

8    sentence that I order is in conformance with the sentencing

9    guideline range that applies to you.  Do you understand what

10   that means?

11             THE DEFENDANT:  I think so, Your Honor.

12             THE COURT:  Okay.  Well, let's say, for example, that

13   the sentencing guideline range for you is 292 to 365 months.

14   If I sentence you anywhere within that guideline range, you've

15   agreed not to challenge that or appeal that in any way.  You've

16   agreed to live with that sentence and not try to reopen the

17   case and challenge it.  That's what it means.

18             THE DEFENDANT:  Okay.

19             THE COURT:  Okay.  And have you made the decision

20   that you intend to plead guilty to Counts 1 and 3 here,

21   kidnapping and drug conspiracy?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  Have you ever been forced or threatened

24   by anyone to come in here this morning to plead guilty?

25             THE DEFENDANT:  No, sir.

49

1       THE COURT:  Been promised anything or guaranteed

2  anything by anyone in exchange for pleading guilty other than

3  what's contained in the Plea Agreement?

4       THE DEFENDANT:  No, sir.

5       THE COURT:  All right.  Do you have any questions so

6  far?

7       THE DEFENDANT:  No, sir.

8       THE COURT:  Then I want to talk to you about these

9  sentencing guidelines and how they apply to you.  And you've

10 probably come to learn enough about those in the last few

11 months, but in the federal system we have a comprehensive set

12 of guidelines contained in this big manual.  The guidelines

13 used to be mandatory up until six, seven years ago.  Now they

14 are considered to be advisory.  That means judges can follow

15 the guidelines or they can choose not to.  They can go above

16 the guidelines in the sentence that they order or they can go

17 below the guidelines.

18      But nationwide the federal government keeps very

19 close tabs on what federal judges are ordering in terms of a

20 sentence.  There's about 80,000 defendants sentenced every year

21 in the federal system, and 80 percent of those sentences are

22 sentences that fall within the guideline range that applies to

23 the defendant.  Eighty percent of the time, no matter where you

24 are in the federal court system, you are going to receive a

25 sentence that falls within the guidelines or it falls within a

50

range that's been recommended by the Government if a defendant

cooperates and provides substantial assistance and gets a

reduced sentence.  So even though the guidelines are considered

to be advisory, they still play a significant role in the

sentences handed down.

The guidelines aren't the only factors that a judge

is supposed to consider.  There's a lot of other sentencing

factors prescribed by federal law and statutes, but the

guidelines are a pretty significant tool in the sentences

handed down.  There's two things that impact your sentence

under the guidelines.  One is the particular crime, and the

other is your criminal history.  Mr. Hagler said that you don't

have a criminal history, so you fall at the bottom of the totem

pole with a criminal history category of one.

The other factor that impacts your sentence is the

crime.  Every crime in the federal system carries a certain

numerical value, and with almost every crime there are certain

adjustments upward or downward.  And you, of course, get a

three-level downward adjustment to that point value by

cooperating and signing a Plea Agreement and avoiding a trial,

but there's other adjustments as well.

But Mr. Hagler, at the start of the hearing I asked

him what the parties contemplate, and he said the Government

believes that the sentencing guideline range for you is going

to be an adjusted level of 40.  That's the numerical value

1    associated with all of these crimes, Criminal History

2    Category I, and the sentencing table of the guidelines reveals

3    that that results in an advisory sentence range of 292 to

4    365 months.  Is that what you've been told?

5         THE DEFENDANT:  Yes, sir.

6         THE COURT:  Everything is in terms of months in the

7    federal system, but that equates with a sentence in the range

8    of 24, 25 to 30 years, understood?

9         THE DEFENDANT:  Yes, sir.

10:12  10         THE COURT:  Do you have any questions about the

11   sentencing guidelines?

12        THE DEFENDANT:  No, sir.

13        THE COURT:  When we come to the sentencing hearing,

14   both attorneys have an opportunity to make their arguments as

15   to what they believe would be an appropriate sentence, and I

16   don't have to follow what they've recommended.  I can sentence

17   you really anywhere in this case, understood?

18        THE DEFENDANT:  Yes, sir.

19   ███████████████████████████████████████████

10:13  20   ███████████████████████████████████████████

21   ███████████████████████████████████████████████

22   ██████████████████████████████████████████████████

23   ██████████████████████████████████████████████████

24   █████████████████████████████████████████████████

25   ████████████████████████████████████████████████





1           THE COURT:  All right.  Then I want to talk to you

2    about the Plea Agreement here.  Do you have that in front of

3    you?

4           THE DEFENDANT:  Yes, sir.

5    ████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████

7    ██████████████████████████████████████████

8           Is that your signature on page 17 of the Plea

9    Agreement?

10  10:17          THE DEFENDANT:  Yes, sir.

11          THE COURT:  Okay.  Then I want to talk to you about

12   paragraph 24 found on page 16.  That's entitled "Appeal

13   Waiver."  It's an important paragraph in the Plea Agreement,

14   and I can tell you that almost every plea agreement signed by a

15   defendant in federal court throughout the country contains a

16   paragraph similar to this.  Appeal waiver means giving up your

17   right to appeal, and most plea agreements contain a paragraph

18   like this because the parties want to put an end to this case

19   after you've been sentenced and hopefully avoid more appeals

20  10:18   and legal challenges and efforts to reopen the case.  And the

21   Courts of Appeals have said throughout the country it is

22   permissible to put a paragraph like this into a Plea Agreement,

23   and they enforce these paragraphs against defendants.

24          The paragraph contains a lot of legalese, fancy

25   lawyer language, but here's what it means for you.  In very

1    simple terms it means that if we get to the sentencing hearing

2    and I sentence you anywhere within the guideline range that is

3    found to apply to you -- let's assume it's 292 to 365 months.

4    If I sentence you anywhere within that range, in this paragraph

5    you are saying, "Judge, I'm not going to challenge or appeal

6    that.  I'm not going to challenge or appeal these convictions

7    on my record, and I'm not going to challenge the sentence that

8    you've ordered me to serve.  I will live with it."  That's what

9    it says.  Do you have any questions about that?

10:18   10          THE DEFENDANT:  No, sir.

11          THE COURT:  If I chose to go above the guidelines,

12   then the -- it's a different set of rules.  Then you certainly

13   can appeal that, but if the sentence is in conformance with the

14   advisory guideline range that applies to you, then you have

15   agreed that you are not going to appeal that determination,

16   that sentence.

17          And then let's turn to paragraph 6.  It's a lengthy

18   paragraph.  It starts on the bottom of page 2 and runs into

19   page 5.  Paragraph 6 is a capsule summary of the facts in this

10:19   20   case that resulted in you being charged with these crimes in

21   federal court.  Before I can accept a plea of guilty from you,

22   I need to make certain that there are sufficient facts that

23   would support finding you guilty.  That's the purpose of

24   paragraph 6.  We've talked about most of what is contained in

25   paragraph 6, but my question to you is, have you reviewed

1    paragraph 6 before today?

2                    THE DEFENDANT:   Yes.

3                    THE COURT:   Are there any factual statements

4    contained in paragraph 6 that you disagree with?

5                    THE DEFENDANT:   Just in Count 3, where it says

6    beginning in or about January of 2012.

7                    THE COURT:   Okay.

8                    THE DEFENDANT:   Because it didn't begin until April.

9                    THE COURT:   Began for you in April of 2012.

10:20  10            THE DEFENDANT:   Yes.

11                   THE COURT:   Okay.   Anything else in paragraph 6 that

12   you tend to disagree with?

13                   THE DEFENDANT:   Section F, where it says that I and

14   other conspirators threatened, intimidated and assaulted

15   distributors and recipients of drugs to prevent the reporting

16   and disclosure of their criminal activities to authorities.   I

17   only assaulted one person.

18                   THE COURT:   Okay.   Fair enough.

19                   THE DEFENDANT:   And then that's it, Your Honor.

10:21  20            THE COURT:   Okay.   But you were involved in efforts

21   to collect monies from those that hadn't paid the family, so to

22   speak.

23                   THE DEFENDANT:   Yes.

24                   THE COURT:   And those efforts could -- could they be

25   interpreted as intimidation or threats, or --

57

1          THE DEFENDANT:  I wouldn't consider them that.  I

2    mean, they could be, but, you know, they were supposed to be

3    buddies, friends, you know, so I just -- I wouldn't have seen

4    me -- or them walking towards me in an intimidating way, so, I

5    mean -- I mean, I guess they could be.

6          THE COURT:  Okay.  Mr. Hagler, anything else about

7    the factual basis surrounding these charges that you wish to

8    note for the record?

9          MR. HAGLER:  No, not at this time, Your Honor.

10         THE COURT:  Mr. Espeseth?

11         MR. ESPESETH:  No, Your Honor.  I think there's

12   certainly a sufficient factual basis already.

13         THE COURT:  And, Mr. Woodford, unless you have any

14   questions -- do you?

15         THE DEFENDANT:  Yeah, actually.

16         THE COURT:  Okay.  Fair enough.

17   ███████████████████████████████████████████

18   ████████████████████████████████████████████████

19   █████████████████████████████████████████████████

20   ████████████████████████████████████████████████

21   █████████████████████████████████████████████████

22   █████████████████████████████████████████

23   ██████████████████████████████████████████████████

24   ███████████████████████████████████████████████

25   █████████████████████████████████████████████████





10:25

             THE COURT:   Any other questions?   Anything is fair
game.

             THE DEFENDANT:   Not -- not at -- not at this time.

             THE COURT:   Okay.   Well, then I'm going to ask you

10:26   how you wish to plead to these charges in the Indictment, and I
can read the charges to you in their entirety or simply
summarize them for you and ask how you plead.   What are your
wishes?

             THE DEFENDANT:   If you were to read them in entirety,
you would just reread this, right?

1          THE COURT:   Exactly.

2          THE DEFENDANT:   Summarize.

3          THE COURT:   Okay.   You've got the Indictment in front

4     of you?

5          THE DEFENDANT:   Yes.

6          THE COURT:   All right.   With respect to Count 1,

7     which is the kidnapping charge set forth in detail in the

8     Indictment, sir, how do you wish to plead, guilty or not

9     guilty?

10:27   10          THE DEFENDANT:   Guilty.

11          THE COURT:   With respect to Count 3, which is the

12     charge entitled conspiracy to distribute and possess with

13     intent to distribute methamphetamine, how do you wish to plead,

14     sir, guilty or not guilty?

15          THE DEFENDANT:   Guilty.

16          THE COURT:   The Court does accept your pleas of

17     guilty to both Counts 1 and 3, Mr. Woodward -- or Woodford, I

18     should say.   I find that you are a competent young man who

19     understands what you have been charged with and what the

10:27   20     penalties are under federal law for these offenses.   I find

21     that you have entered a knowing and voluntary plea of guilty to

22     both charges with the assistance of your attorney.   I also find

23     that there are sufficient facts set forth in paragraph 6 of the

24     Plea Agreement, as well as your responses to my questions here

25     this morning that support finding you guilty of both of these

1    offenses as required under Rule 11, so I accept your pleas of

2    guilty.

3            Here's what's going to happen next.  I'm ordering

4    that the U.S. Probation Office begin work on what's called a

5    presentence investigation report.  Every time a defendant in

6    federal court pleads guilty to a felony offense or is found

7    guilty by a jury, we have a presentence investigation report

8    done.  It's a report that is primarily used for sentencing

9    purposes.  It's a report that's prepared by a federal probation

10:28    10   officer, and I believe Ms. Helderop is -- sitting over here is

11   probably the federal probation officer that will be doing that

12   report.

13           She will schedule an interview with you.  Your

14   attorney has a right to be present when you are interviewed by

15   her.  She will ask you many of the same types of questions that

16   I've asked of you.  This report is a detailed summary of your

17   life.  It contains information about your family, your

18   education, your work history, your criminal history, and a

19   lengthy discussion concerning the sentencing guidelines and how

10:29    20   they apply to you.

21           It will take several months to complete that report.

22   Yours may not be the only interview that she will conduct.  And

23   she first prepares the report in a draft format and sends it

24   out to the attorneys to give them a chance to look it over.  We

25   want the reports to be as accurate as possible, so that's why

                                 62

1   they're sent out beforehand.  They're sent out to the

2   attorneys, not to myself.  You will get a copy of that draft

3   presentence report from Mr. Espeseth.  Please read it over.

4   When you read it over, if there's anything in that report that

5   you don't believe is accurate, all that you need to do is call

6   Mr. Espeseth up and tell him what it is.  He will then contact

7   the probation office and work with them to try to fix that to

8   make sure it is accurate.

9           When you're reading through the report, if there's

10:30   10   anything in it that you don't understand, and there very well

11   may be because the reports are not always so easy to

12   understand, don't be shy, ask questions.  Mr. Espeseth has

13   looked at hundreds and hundreds of these.  He can answer any

14   question that you have about the report, but don't feel like

15   that you're imposing upon him and don't feel like you're stupid

16   if you've got a question.  There's no such thing as a stupid

17   question.  You need to know what's in the report.  The report

18   goes to the Bureau of Prisons and the Department of Justice and

19   it's used for a lot of purposes.

10:30   20           Ultimately after everybody has had an opportunity to

21   comment on the accuracy of the report, it will be finalized and

22   then sent out again to the attorneys before the sentencing

23   hearing.  I get a copy of it at that time, not before.  We have

24   a sentencing hearing that is scheduled for Monday, June 17th,

25   at 1:30 in Bismarck.  When is the trial scheduled?

63

1    MR. HAGLER:  I believe May 14, Your Honor.

2    THE COURT:  Okay.

3    THE DEFENDANT:  13th.

4    MR. HAGLER:  13th.

5    THE COURT:  And is it likely that the other four

6 defendants are going to be pleading, or do you expect that

7 there may be one or more that will choose to have this played

8 out in front of a jury?

9    MR. HAGLER:  At this point, Your Honor, we don't have

10 anything else formal with any of the other defendants, but I --

11 I don't anticipate a trial at this point.

12    THE COURT:  I don't think the case would play out

13 very well in front of a North Dakota jury.  But questions, sir,

14 that you have before we close this hearing?

15    THE DEFENDANT:  Just -- I just want to -- no.  No.

16    THE COURT:  All right.  You have a good understanding

17 of what's gone on here today?

18    THE DEFENDANT:  Pretty much, yep.

19    THE COURT:  All right.  Anything else, gentlemen?

20    MR. HAGLER:  No, Your Honor.  Thank you.

21

22

23

24

25

1

2

3          THE COURT:   Sure.

4          MR. ESPESETH:   Thank you, Your Honor.

5          THE COURT:   I figured you had.   If there's nothing

6     else --

7          MR. ESPESETH:   But nothing else, Your Honor.

8          THE COURT:   Thank you for getting this matter

9     resolved by way of a Plea Agreement, and we will stand

10:32     10     adjourned.

11          (Concluded at 10:32 a.m., the same day.)

12                    - - - - - - - - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

1          <u>CERTIFICATE OF COURT REPORTER</u>

2          I, Sandra E. Ehrmantraut, a Certified Realtime

3   Reporter,

4          DO HEREBY CERTIFY that I recorded in shorthand the

5   foregoing proceedings had and made of record at the time and

6   place hereinbefore indicated.

7          I DO HEREBY FURTHER CERTIFY that the foregoing

8   typewritten pages contain an accurate transcript of my

9   shorthand notes then and there taken.

10          Dated this 27th day of March, 2013.

11

12                                  <u>/s/ Sandra E. Ehrmantraut</u>
                                    Certified Realtime Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25